**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Douglas BOSS, Defendant-Appellant.**

**No. 79–2288.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Dec. 16, 1980.

Decided Feb. 18, 1982.

Michael Burrage, Antlers, Okl. (Joe Stamper, of Stamper, Otis & Burrage, Antlers, Okl., was on the brief), for defendant-appellant.

James E. Edmondson, Asst. U. S. Atty., Muskogee, Okl. (Julian K. Fite, U. S. Atty., Muskogee, Okl., was on the brief), for plaintiff-appellee.

Before HOLLOWAY, LOGAN and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant Douglas Boss, along with Henry Jackson Sikes, Harvey Don Davidson, and Stanley Mathis, was charged with violating 18 U.S.C. § 1955 for his role in a gambling business conducted at the Texhoma Club in Choctaw County, Oklahoma. The indictment alleged that the business operated continuously from on or about September 6, 1974, to May 5, 1979. Boss was tried alone; the other three indicted defendants testified for the Government. Boss was found guilty by a jury and sentenced to imprisonment for three years.

The dispositive issue is whether the five or more persons requirement of § 1955(b)(1)(ii) was satisfied.[1] For this reason the background facts must be reviewed in some detail.

### I

The front portion of the Texhoma Club was a beer and dance hall. This area was used by large groups ranging between 200 to 400 persons a night and was about 100 by 150 feet in size. In the back room of the club, a casino-style dice game was regularly conducted on Friday and Saturday nights and on most Wednesday nights. Approximately 25 to 30 people would gather around the dice table in this back room. Although most of the club's customers patronized only the front portion of the club, all were permitted to participate in the gambling activities in the back room. (II R. 83–84).

1. 18 U.S.C. § 1955 provides in pertinent part:
*Prohibition of illegal gambling businesses*
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
(b) As used in this section—
(1) "illegal gambling business" means a gambling business which—
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) *involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business and*

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
(2) *"gambling" includes* but is not limited to pool-selling, bookmaking, *maintaining* slot machines, roulette wheels or *dice tables* and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico and any territory or possession of the United States. (Emphasis added).

Davidson leased the club from his mother and two brothers and owned the fixtures in the club. Boss worked at the club on and off, beginning in about 1974. Testimony as to the exact scope of Boss's duties as an employee was conflicting. As described by various witnesses, his activities included working behind the bar, acting as a bouncer, supervising the dice game, and managing the club for Davidson. (II R. 102, 115, 136–137, 164, 184, 194 and 203). Boss leased the club from Davidson for several months in the summer of 1977; he had also leased it several years previously for a similar period. Around August 1977, Boss ceased to be involved with the operation at the club. Boss took the stand and, contrary to the testimony of the other witnesses, testified that his lease extended only to the front portion of the club, that during his lease period Davidson continued to run the dice game in the back room, and that he was never involved in conducting the dice game.

The club employed a number of people in various capacities. A croupier, or "stickman," actually ran the game and was the only employee whose duties related solely to the back room. Various people were employed in this capacity during the period covered by the indictment. There were a bartender and back-up bartender. Three waitresses served drinks to the club's patrons in the dance hall and to persons in the back room at the dice table. A four-person band performed in the dance hall in the front portion of the club and could be heard in the dice room. Sikes testified that on occasion the band leader would announce that gambling was about to begin. (II R. 117). A bouncer was employed to keep order among the customers; his duties apparently extended to both the front and back portions of the club. (II R. 171, 186). There was also an employee at the front door of the dance hall who was responsible for collecting cover charges when customers entered the club.

As noted, § 1955(b)(1) sets forth three basic requirements for a gambling business to be a violation of federal law—an illegal gambling business, five or more persons who conduct the business, etc., and substan-tially continuous operation for over 30 days or a gross revenue of $2,000 on any one day. It is undisputed that the dice game operated at the Texhoma Club was an illegal gambling business under Oklahoma law, 21 O.S. § 941, and that the business remained in substantially continuous operation for a period in excess of thirty days, thus satisfying the first and third requirements set out in § 1955(b)(1)(i) and (iii).

The controlling issue is the sufficiency of the evidence to meet the requirement of § 1955(b)(1)(ii) that the business involve *"five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business . . . ."* (Emphasis added). At trial, defendant moved for a directed verdict after the prosecution rested its case, specifically arguing that the five or more person requirement was not met by the proof. The trial judge denied the motion. (II R. 221–22). The motion was renewed on these grounds after all the evidence was presented and again denied. (II R. 262). The case was submitted to the jury, the defendant objecting to the charge on the five or more persons requirement, and the guilty verdicts were returned. For reversal the defendant argues, *inter alia*, that there was error in the rulings on the sufficiency of the evidence to meet the five or more persons requirement of § 1955, and that the federal offense was therefore not established. (Appellant's Brief at 6, 12). The Government addressed the five or more persons requirement as the first issue in its brief, arguing that it had more than satisfied the statutory requirement. (Brief of Appellee at 9–10).

II

When addressing the scope of § 1955(b)(1)(ii), this Court, in *United States v. Smaldone*, 485 F.2d 1333, 1351 (10th Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286, stated:

[T]he five individual participants necessary to sustain a federal conviction need not carry on or cause the entire gambling operation to function. Congress' intent

was to incorporate within the statute's prohibition all participants, except those who actually wagered, no matter their roles including "high level bosses and street level employees." 2 U.S.Code Cong. and Admin.News 1970, pp. 4029–4030 . . . .

Similarly, in *Sanabria v. United States*, 437 U.S. 54, 70 n.26, 98 S.Ct. 2170, 2182 n.26, 57 L.Ed.2d 43 the Court stated that the statute "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." We note that all the cases[2] cited by the Court on this proposition involved prosecutions of geographically distinct bookmakers who exchanged line information and placed "layoff" bets with other bookmakers located elsewhere.[3] Such cases thus point to sufficient connections between the gambling operations so that they are viewed as one gambling business under § 1955, all the operations involving, however, some actual gambling function necessary to the illegal operation.

In a case involving another bookmaking operation this court upheld an instruction defining "[t]he word . . . 'conduct' as including all who participate in the operation of the gambling business, 'regardless of how minor their jobs and whether or not they be labeled as agents, runners, or independent contractors', excepting the person who simply places a bet." *United States v. Smaldone*, 583 F.2d 1129, 1132 (10th Cir.), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40. This is similar to the instruction given in *United States v. Smaldone*, 485 F.2d 1333, *supra*. Our two *Smaldone*

cases upheld the convictions of persons who were bookmakers themselves, and in the latter opinion, *id.* at 1338–39, we enumerated those who were the "conductors" of the bookmaking operation within the meaning of § 1955—the runners, phone men, relay or pickup men, bookkeepers and managers—all persons with some function necessary to the illegal gambling operation, although they included persons on lower as well as higher echelons.

In *United States v. Morris*, 612 F.2d 483 (10th Cir.), another bookmaking case, we recognized again that some function necessary to the gambling operation is required and that activity which may be merely helpful to an illegal gambling business does not make the actor a conductor of the illegal business. There one defendant permitted some of the principals in a bookmaking operation to use her apartment and received some phone messages for them. We held that although there was sufficient evidence to convict her as an aider and abettor under 18 U.S.C. § 2, "she was not shown to be among the 'high level bosses [or] street level employees' of the gambling business." *Id.* at 494. Thus, she could not be convicted or counted[4] as among the requisite five or more participants who "conduct, finance, manage, supervise, direct, or own" a gambling business. On the other hand, a manager/bartender at a club was held to be countable as a participant in the bookmaking operation with which he had contact, there being evidence that the bartender actually functioned as a bookmaker,

---

**2.** *United States v. DiMuro*, 540 F.2d 503, 507–08 (1st Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749; *United States v. Leon*, 534 F.2d 667, 676 (6th Cir.); *United States v. Brick*, 502 F.2d 219, 225 n.17 (8th Cir.); *United States v. Smaldone*, 485 F.2d 1333, 1351 (10th Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286; *United States v. Hunter*, 478 F.2d 1019, 1021–22 (7th Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107; *United States v. Ceraso*, 467 F.2d 653, 656 (3rd Cir.); *United States v. Becker*, 461 F.2d 230, 232–33 (2nd Cir.), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208.

**3.** *United States v. Schaefer*, 510 F.2d 1307 (8th Cir.), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1975, 44 L.Ed.2d 466, offers a generally accepted definition of a layoff bet, at 1311 n.5:

"[A] bet or wager placed by one bookmaker with another bookmaker which is necessitated by the influx of an imbalance of bets and wagers on a given sporting event and which has the effect of distributing the said bets and wagers, thus minimizing the risk of substantial loss."

**4.** It is clear that a person need not be a defendant or be convicted under § 1955 to be counted as one of the required five persons who conduct, etc., the illegal gambling business. *U. S. v. Quarry*, 576 F.2d 830, 833. (10th Cir.).

accepting football wagers placed through the organization with the expectation of receiving higher tips. 612 F.2d at 493–94.

The "conduct, finance" etc. terms of the statute focus on some actual involvement in the gambling operation, as our *Smaldone* and *Morris* opinions illustrate. We are convinced that this interpretation conforms to the clear terms of the statute as well as the legislative history of § 1955. For although the statute contemplated "high level bosses and street level employees," it was intended "to reach only those persons *who prey systematically* upon our citizens and *whose syndicated operations are so continuous and so substantial* as to be of national concern . . . ." H.Rep.No.91–1549, 91st Cong., *reprinted in* [1970] U.S.Code Cong. & Ad. News 4007 at 4029. (Emphasis added.). The House Report stated (*id.* at 4029):

> The section applies generally to persons who *participate in the ownership, management, or conduct of an illegal gambling business. The term "conducts" refers both to high level bosses and street level employees.* It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet. (Emphasis added).

As explained further in Part III, this case focuses particularly on the three waitresses and we conclude that their activities in these circumstances do not bring them within the reach of § 1955 as conductors or the like of the illegal gambling business. It is true that in some cases where a more substantial showing was made of the relationship of the activities of waitresses to a gambling business they were counted as

participants.[5] We would agree that waitresses acting as security guards who identify customers for admission as well as serving drinks and food to gamblers, as in *Colacurcio*, could be "conductors" performing a necessary function for the illegal gambling business. We do not agree, however, with the statutory interpretation which includes waitresses or others because their activity may be merely helpful to the illegal gambling business. *See United States v. Tucker*, 638 F.2d 1292, 1295–96 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 132, 70 L.Ed.2d 111; *United States v. Bennett*, 563 F.2d 879, 883 (8th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282.

■ In conformity with our *Smaldone* enumeration of bookmaking conductors, 485 F.2d at 1338–39, and our *Morris* case, we are convinced that participants who may be counted as conductors include those on lower or higher echelons, but with a function at their level necessary to the illegal gambling business. This conforms to the wording and history of § 1955, we feel, as well as to the Court's discussion in *Sanabria* of participation in an illegal gambling business. *See* Part II, and note 2, *supra*. To extend the statute further so as to treat as "conductors" all those involved in some activity merely helpful to a gambling business would federalize prosecution of a host of activities beyond the legislative intent. Moreover, to hold that waitresses in the circumstances of this case could be counted conductors would mean, of course, that they are subject to conviction of the federal crime (though they need not be charged or convicted to be counted). We are convinced

---

5. In *United States v. Tucker, supra*, 638 F.2d 1292, 1294–96 (5th Cir.), *cert. denied*, —— U.S. –——, 102 S.Ct. 132, 70 L.Ed.2d 111, the Fifth Circuit held that nightclub waitresses who served drinks to gamblers, made change for them to use in placing bets in a cash game, and delivered phone messages to the gamblers, all in a downstairs part of a club where a blackjack game was conducted, could be counted. In *United States v. Colacurcio*, 659 F.2d 684 (5th Cir.), the court relied on *Tucker* and counted two waitresses who served sandwiches and drinks to the players in a second floor casino renovated and equipped for gambling,

there being no other activity carried on. The waitresses "also acted as security guards by looking through a peephole in the casino's door" and identifying customers who were recognized for admission. *Id.* at 686. In *United States v. Bennett*, 563 F.2d 879, 883 (8th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282, the court held that a woman who solicited and served free drinks to customers at a craps table, and who allowed persons in and out of the gambling establishment and closed the door behind them, could be counted as a participant.

such an interpretation is beyond the intended reach of the statute.

## III

As noted, defendant's motion for a directed verdict at the close of all the evidence challenged the Government's proof on the five or more persons requirement, which ground was specifically argued.[6] Where, as here, such a motion made when the Government first rested is waived by defendant's presentation of evidence but then renewed at the close of all the evidence, the sufficiency of the evidence is to be determined by an examination of the entire record. *United States v. Greene*, 442 F.2d 1285, 1286–87, n.3 (10th Cir.).

An examination of the entire record, viewed with appropriate inferences in the light most favorable to the Government, shows these facts on the five or more persons requirement. The evidence is conflicting and somewhat unclear as to Davidson's role at times in the dice game and as to the nature of Boss's role as an employee when he was not the lessee. Nevertheless the jury could arguably infer that both Davidson and Boss were involved in conducting the business at the same time. Next, the croupier can clearly be counted as a conductor and thus as a third participant. Both Mathis and Sikes, during different spans of time, were employed as croupiers during periods when Boss worked at the club, and the jury could properly infer that one of them as croupier was involved in the business simultaneously with the possibly concurrent involvement of both Davidson and Boss. (II R. 69, 86–87, 105–106, 111, 113).

Further, there was some evidence that the bouncer's responsibility for keeping order extended to the back room in which the dice game took place (II R. 171, 186), and this function arguably could make the bouncer a conductor of the dice game. *Cf. United States v. Mattucci*, 502 F.2d 883, 888 (6th Cir.) (duties of guard in a gambling room included keeping out drunks and guarding against a hold-up). There is ample testimony that Boss, Mathis, and Sikes all acted as bouncers at different times within the period of the indictment. Although the showing is weak for including the bouncer as a conductor of this gambling operation, there is some evidence that all three individuals who worked as bouncers (Boss, Mathis, and Sikes) were at other times acting as croupier or as manager of the entire club. Hence arguably the jury might find that four persons (Boss, Davidson, Mathis, and Sikes) were participants for some simultaneous 30-day period between 1974 and July 1977 when Boss left, although the testimony is uncertain. However, we need not decide that four such participants could be counted since we must agree with the defendant that no fifth participant was proven to be involved.[7]

The Government contends that any of the waitresses could serve as the requi-

---

**6.** Rule 29(a), Federal Rules of Criminal Procedure, in part provides that "[m]otions for a directed verdict are abolished and motions for judgment of acquittal shall be used in their place." In considering defendant's contentions, we have treated his motions for a directed verdict as if they were motions for judgments of acquittal.

**7.** There is no requirement that five or more participants simultaneously be physically present or actually working. *United States v. Marrifield*, 515 F.2d 877, 880–81 (5th Cir.), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394. Nor need it be shown that each individual participant was involved for more than thirty days or generated at least $2,000 gross revenue in a single day. *United States v. Smaldone, supra*, 485 F.2d at 1351.

The Fifth Circuit has held that if the Government relies on the thirty-day criterion, that requirement must be construed together with the five or more persons requirement so that the business must be "one which operates with a minimum of five persons for a period in excess of thirty days." *United States v. Bridges*, 493 F.2d 918, 922 (5th Cir.). *See also United States v. Gresko*, 632 F.2d 1128, 1132 (4th Cir.). In *Sanabria*, 437 U.S. at 71 n.26, 98 S.Ct. at 2182 n.26, the Court stated that "the Government need not prove that each defendant participated in an illegal gambling business for more than 30 days (or grossed more than $2,000 in a single day), but only that the business itself existed for more than 30 days (or met the earnings criteria)."

site fifth "conductor" since at times they served drinks to customers in the dice room. We cannot agree that the Government's evidence here established that element of the federal criminal conviction. The testimony of the three waitresses indicates no distinction between their duties in the larger dance hall and the smaller dice room. (II R. 170, 185, and 193). The evidence showed only that dancing and drinking occurred in the dance hall portion of the club. It was estimated that there were two to four hundred people a night in the dance hall, which was about 100 by 150 feet in size (II R. 83, 117); the testimony as to those in the back gambling room indicated there were approximately 25 to 30 people there at a time. (II R. 84).

One waitress, Lemons, when asked why she had occasion to go into the dice room, said "I was a cocktail waitress and I served drinks because it was part of my job." She said she took care of customers in the dice room as well as the other parts of the club. There were three waitresses. (II R. 170–71). The other waitresses' testimony concerning their duties showed no more. (II R. 127, 134–35, 142).

■ Thus the Government's evidence here established only that the waitresses served drinks to the larger group in the dance hall and also to a smaller group in the dice room at the back. No showing was made that they served any other functions such as making change for gamblers in a cash game, acting as security guards, identifying customers while tending the door to a gambling room, or the like. There was no proof that they performed functions necessary to the illegal gambling business, and their relationship to it was too attenuated for them to be counted under the federal criminal statute as persons who "conduct, finance, manage, supervise, direct, or own" the gambling business. For similar reasons the bartender, the backup bartender, the woman at the door of the dance hall, and the band members cannot be counted as conductors on this record.

8. Davidson, who testified as a Government witness, said that he owned the fixtures. (II R. 200). On cross-examination he also testified

■ The Government also argues that Davidson's mother and two brothers from whom he leased the club were "owners" of the gambling business. However, there is nothing in the record to indicate that they had any involvement other than owning the building.[8] Mere ownership of the building in which the club was operated by a lessee cannot be held to be ownership of the gambling business, without further proof of actual financial connections and participation in the gambling business on the part of the mother and brothers.

We hold that the Government's proof failed to satisfy the five or more persons requirement of § 1955 for the federal offense charged. Accordingly the judgment is reversed and the case is remanded for dismissal of the indictment.

that his mother and brothers did not own any part of the gambling business. (II R. 212).